❑ Original          ❑



CLERK'S OFFICE
A TRUE COPY
Feb 09, 2024
s/JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) )  Case No. **24-M-330 (SCD)** |
| A black iPhone in a black case, currently in law enforcement custody, as further described in Attachment A | ) ) ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:          Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before          2-23-24          *(not to exceed 14 days)*

❑ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to          Hon. Stephen C. Dries          .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:          2-9-24. 10:05 am          _____*Stephen C. Dries*_____
                                                                              *Judge's signature*

City and state:   Milwaukee, WI          Honorable Stephen C. Dries, U.S. Magistrate Judge
                                                              *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

The property to be searched is a black iPhone in a black case possessed by Christian SANTIAGO-ALBALADEJO on January 29, 2024.

The **TARGET TELEPHONE** is currently being stored at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.

This warrant authorizes the forensic examination of the **TARGET TELEPHONE** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.    All records on the **TARGET TELEPHONE** described in Attachment A that relate to violation of Title 21, United States Code, §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and involve Christian SANTIAGO-ALBALADEJO since January 2019, including, but not limited to:

    a.  lists of customers and related identifying information;

    b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.  any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

    d.  any information recording schedule or travel;

    e.  all bank records, checks, credit card bills, account information, and other financial records;

    f.  Photographs and/or videos depicting possession of drugs;

    g.  Any evidence related to either the ownership, purchase, or possession of drugs;

    h.  Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **TARGET TELEPHONE**;

2. Evidence of user attribution showing who used or owned the **TARGET TELEPHONE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.



CLERK'S OFFICE
A TRUE COPY
Feb 09, 2024
S. JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| A black iPhone in a black case, currently in law enforcement custody, as further described in Attachment A | ) ) ) ) |

Case No. **24-M-330 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Distribution of and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with intent to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Michael LOPEZ
Digitally signed by Michael LOPEZ
Date: 2024.02.08 15:32:53 -06'00'

*Applicant's signature*

Michael Lopez, DEA TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: _2-9-24. 10:05 am_

*Judge's signature*

City and state: _Milwaukee, WI_

Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Michael Lopez, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since March 2020. I am also a Police Officer with the Milwaukee Police Department and have been since September 2000.  As a part of my duties, I investigate criminal violations relating to narcotics trafficking offenses, including violations of Title 21, United States Code, Sections 841, 843, and 846, and federal firearms offenses, including violations of Title 18, United States Code, Sections 922(g), 924(a), and 924(c). In the course of my experience, I have and continue to be involved in investigations of criminal offenses and have assisted with search warrants for items related to gang investigations, organized crime, violent crime, firearms offenses, drug trafficking, thefts, counterfeit crimes, forgeries, including cellular telephones and other electronic telecommunication devices.

3.      As part of my duties as a DEA Task Force Officer, I investigate criminal violations relating to narcotics trafficking and money laundering offenses, including

1

criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved in electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

4. I am familiar with various methods of smuggling and trafficking controlled substances and their proceeds. I am also familiar with methods used to by traffickers to evade detection of both the controlled substances and their proceeds. I have received training in the investigation of and am knowledgeable in investigations pertaining to drug trafficking, illegal firearm possession and trafficking, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises.

5. In addition, through training, experience, and discussions with other experienced agents:

    a. I have learned about the manner in which individuals and organizations distribute controlled substances;

    b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

    c. I am familiar with the language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

2

d. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to, safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts,

3

cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages, and outbuildings), businesses or other locations over which they maintain dominion and control;

j. I know large-scale drug traffickers often use electronic equipment such as telephones (landlines and cellular telephones), computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

m. I know drug traffickers take or cause to be taken photographs of themselves; their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession;

n. I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded; and

4

o. During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

6. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

7. To this end, based upon my training and experience, I know that individuals involved in drug trafficking commonly use cellular telephones to facilitate their drug trafficking activities. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs. I know that drug traffickers commonly maintain and possess multiple cellular telephones, swap out cellular telephones routinely (i.e., discontinue use of one or more cellular telephones and replace them with new phones in hopes of evading detection by law enforcement), and sometimes allow other drug trafficking associates to

use their phones to conduct drug trafficking business. I also know that it is common for crime suspects who illegally possess controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the controlled substances and firearms that they control, possess, buy, and sell.

8.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

9.     The property to be searched is described as a black iPhone in a black case possessed by Christian SANTIAGO-ALBALADEJO on January 29, 2024; hereinafter collectively identified as the "**TARGET TELEPHONE**."

10.     The **TARGET TELEPHONE** is currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.

11.     The applied-for warrant would authorize the forensic examination of the **TARGET TELEPHONE** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

12.     The United States, including the North Central High Intensity Drug Trafficking Area (HIDTA), conducted a criminal investigation of SANTIAGO-ALBALADEJO regarding possible violations of 21 U.S.C. §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to

6

distribute and possess with intent to distribute controlled substances). The investigation revealed that SANTIAGO-ALBALADEJO distributed kilogram-quantities of cocaine in the Milwaukee area in 2021, which cocaine was shipped through the United States Postal Service (USPS) to various addresses in Milwaukee, Wisconsin.

### Confidential Source Identified SANTIAGO-ALBALADEJO as a Kilogram-Level Cocaine Distributor

13.     In August 2019, case agents debriefed a confidential source (hereinafter referred to as the CS) regarding the CS's knowledge of drug trafficking activities. The CS identified SANTIAGO-ALBALADEJO as a Milwaukee-area cocaine distributor.  The CS stated SANTIAGO-ALBALADEJO was receiving kilogram quantities of cocaine from Puerto Rico via parcels that were being shipped through the USPS. The CS stated that in July 2019, the CS went to SANTIAGO-ALBALADEJO's residence located at 679 South Oak Park Court. The CS stated while in the garage, SANTIAGO-ALBALADEJO showed the CS a kilogram quantity of cocaine. The CS stated SANTIAGO-ALBALADEJO indicated he was selling kilogram quantities of cocaine and was having the cocaine shipped from Puerto Rico via the USPS.

14.     In January 2020, SANTIAGO-ALBALADEJO ceased communicating with the CS. The CS believed this was due in part to an unrelated drug investigation in Milwaukee, Wisconsin, which resulted in the arrest of several members of a cocaine drug trafficking organization. Although SANTIAGO-ALBALADEJO was not a target in this unrelated investigation, case agents believe he may have had loose affiliations with those

7

arrested, leading case agents to believe that this affiliation may have caused SANTIAGO-ALBALADEJO to temporarily stop any illegal activities in the Milwaukee area.

15.     In January of 2021, the CS informed case agents that SANTIAGO-ALBALADEJO re-established contact with the CS and was once again selling kilograms of cocaine. The CS further provided SANTIAGO-ALBALADEJO's phone number as 414-807-3838, or the 3838 Phone.

16.     The CS provided information to law enforcement between December 2018 and Fall of 2021. The information the CS has provided is against the CS's penal interest. Additionally, to the extent possible, information provided by the CS has been corroborated by agents through external sources, including physical evidence, consensually recorded telephone calls, phone toll information, audio recordings, surveillance, and law enforcement databases. The CS was cooperating in exchange for consideration on Wisconsin state drug and firearm related offenses, and details of the CS's cooperation were forwarded to the state court judge at the time of sentencing for judicial consideration. The CS has a criminal history that includes felony drug offenses and bodily security offenses. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe the CS is credible and the CS's information reliable.

**Physical and Electronic Surveillance Confirm SANTIAGO-ALBALADEJO
was the User of the 3838 Phone**

17.     On January 21, 2021, case agents learned that SANTIAGO-ALBALADEJO was scheduled to report to the Milwaukee County House of Correction for an unrelated

8

criminal case that required work-release. Case agents responded to the House of Corrections in anticipation of SANTIAGO-ALBALADEJO's departure. While conducting surveillance of the parking lot, case agents observed a black Dodge Ram truck pull into the parking lot of the House of Corrections. A Hispanic male subject exited the truck and went inside the House of Corrections. Minutes later, case agents observed the same male subject exit the House of Corrections with another male subject, positively identified as SANTIAGO-ALBALADEJO. The two parties departed in the Dodge truck, and surveillance was terminated.

18.     Case agents obtained an administrative form from the House of Corrections that provided SANTIAGO-ALBALADEJO's contact information. In the form, SANTIAGO-ALBALADEJO provided a home address of 6611 West Howard Avenue, Apartment No. 3, and cellular phone number of 414-807-3838, which was the same number the CS provided to case agents for SANTIAGO-ALBALADEJO.

19.     On January 27, 2021, the Honorable William E. Duffin, U.S. Magistrate Judge for the Eastern District of Wisconsin, authorized a GPS Ping, Pen Trap and Trace search warrant for SANTIAGO-ALBALADEJO's 3838 Phone, 414-807-3838. See Case No. 21 MJ 60. An extension of this court order was authorized on or about February 23, 2021.

20.     On February 5, 2021, the Honorable Stephen C. Dries, U.S. Magistrate Judge for the Eastern District of Wisconsin, authorized a federal GPS tracking warrant for a 2008 blue Ford F-250, bearing Wisconsin registration RN7422. See Case No. 21-M-310. The vehicle was identified by the CS as being used by SANTIAGO-ALBALADEJO.

9

21.     On February 10, 2021, using the location data for SANTIAGO-ALBALADEJO's phone and vehicle, case agents conducted physical surveillance of SANTIAGO-ALBALADEJO as he traveled throughout the Milwaukee, Wisconsin region in the Ford F-250. Case agents observed the Ford arrive at the Xperience Fitness at 6706 West Greenfield Avenue, West Allis, Wisconsin. Case agents observed SANTIAGO-ALBALADEJO exit the vehicle and talk on a cellular telephone as he walked into the business. Location information for SANTIAGO-ALBALADEJO's 3838 Phone placed the cellular phone in the general area of Xperience Fitness.

### Agents Seize 1 Kilogram Cocaine from Parcel 1

22.     In early January 2021, the CS informed case agents that the CS recently was in contact with SANTIAGO-ALBALADEJO at the 3838 Phone. The CS stated SANTIAGO-ALBALADEJO asked whether the CS was interested in receiving a kilogram of cocaine shipped to the CS via USPS. At the direction of case agents, the CS provided SANTIAGO-ALBALADEJO with an address to which the parcel could be shipped.

23.     Later in the same week, case agents provided the CS with a recording device to monitor conversation between the CS and SANTIAGO-ALBALADEJO. During a recorded call over the 3838 Phone, SANTIAGO-ALBALADEJO informed the CS the parcel was shipped and provided the CS with a tracking number of 9505514558211015330175, a U.S. Priority Mail Express Parcel, Parcel 1, to track the parcel.

24.     On January 18, 2021, case agents located Parcel 1 at the USPS facility in Oak Creek, Wisconsin and seized it. Parcel 1 reflected it was sent from Raul Rivera, P.O. Box 521, Bajadero, Puerto Rico 00616 to Hector Roman at 2238 South 15th Place, Milwaukee,

10

WI 53215. Based on their training and experience, case agents know that drug traffickers will commonly track drug parcels when they are en route to their destination. Therefore, USPS records associated with Parcel 1 were updated to reflect that the parcel was shipped to Lincoln, Nebraska to confuse anyone that was tracking the parcel.

25. On January 19, 2021, during a recorded conversation between the CS and SANTIAGO-ALBALADEJO, who was using the 3838 Phone, SANTIAGO-ALBALADEJO told the CS how to track the parcel using the USPS website.

26. On January 20, 2021, Parcel 1 was searched pursuant to a federal search warrant. See Case No. 21 MJ 41. During a search of Parcel 1 case agents recovered approximately 1.05 kilograms of cocaine. The kilogram had "30" stamped on one side.

27. On January 20, 2021, during a recorded call over the 3838 Phone, the CS spoke with SANTIAGO-ALBALADEJO about Parcel 1. The CS, despite knowing the case agents already seized the parcel, informed SANTIAGO-ALBALADEJO the parcel was in Lincoln, Nebraska. SANTIAGO-ALBALADEJO told the CS that he (SANTIAGO-ALBALADEJO) thought the parcel was on "Lincoln." Case agents believe SANTIAGO-ALBALADEJO was referring to the United States Post Office at 4300 West Lincoln Avenue, West Milwaukee, Wisconsin. SANTIAGO-ALBALADEJO told the CS he was going to call about the parcel and attempt to locate the receipt to verify the address. Later in the call, the CS asked SANTIAGO-ALBALADEJO how much the kilogram was going to cost, and SANTIAGO-ALBALADEJO told the CS "39." Based on their training, experience, and familiarity with the investigation, case agents know SANTIAGO-ALBALADEJO was charging the CS $39,000 for the kilogram of cocaine.

11

28. On January 23, 2021, during a recorded call over the 3838 Phone, the CS spoke with SANTIAGO-ALBALADEJO about Parcel 1. SANTIAGO-ALBALADEJO told the CS the parcel had not moved. SANTIAGO-ALBALADEJO informed the CS this has happened to SANTIAGO-ALBALADEJO in the past, and SANTIAGO-ALBALADEJO did not seem concerned with the delayed delivery. Case agents believe SANTIAGO-ALBALADEJO was referring to a previously lost narcotics-parcel.

**SANTIAGO-ALBALADEJO Traveled to Florida in February 2021**

29. During the week of February 15, 2021, the CS contacted case agents regarding a recent conversation the CS had with SANTIAGO-ALBALADEJO over the 3838 Phone. The CS stated SANTIAGO-ALBALADEJO informed the CS that SANTIAGO-ALBALADEJO was planning to go to Puerto Rico in the coming days to meet with a new source of supply.

30. SANTIAGO-ALBALADEJO told the CS that SANTIAGO-ALBALADEJO had "one" left and asked if the CS wanted it. The CS stated the CS believed SANTIAGO-ALBALADEJO indicated he could supply the CS one kilogram of cocaine for distribution. The CS further stated the CS declined to accept the kilogram from SANTIAGO-ALBALADEJO at the time.

31. On February 19, 2021, case agents learned the tracking device on the Ford F-250 was traveling into Illinois. On the same date, GPS pings from SANTIAGO-ALBALADEJO's 3838 Phone showed the phone was near O'Hare Airport. The GPS on the F-250 continued to travel south. A few hours later, GPS pings from the 3838 Phone reflected that it was in Ocala, Florida.

32.    GPS pings from SANTIAGO-ALBALADEJO's 3838 Phone showed the phone in Florida until February 22, 2021. GPS tracking information from SANTIAGO-ALBALADEJO's F-250 showed on February 20, 2021, the F-250 arrived near the residence of 6600 SW 129th Loop, Ocala, Florida, and remained at the location over the next few days.  Based on these events, case agents believe SANTIAGO-ALBALADEJO traveled to Florida via a flight and an unknown subject drove SANTIAGO-ALBALADEJO's truck to Ocala, Florida.

33.    Case agents conducted a toll analysis of SANTIAGO-ALBALADEJO's 3838 Phone and determined that on February 18, 2021, and February 19, 2021, it was in frequent contact with telephone numbers having Puerto Rican area codes. SANTIAGO-ALBALADEJO's 3838 Phone was also in frequent contact with a telephone subscribed to a Jose A Serrano, who was associated with the address of 6600 SW 129th Loop, Ocala, Florida, pursuant to law enforcement databases.

34.    In reviewing flight records for February 19, 2021, case agents learned Spirit Airlines had a direct flight from Chicago, Illinois (ORD) to Orlando, Florida (MCO).  Case agents sent an administrative subpoena to Spirit Airlines for a passenger manifest.  The passenger manifest for Spirit Airlines Flight #929 ORD to MCO (Feb. 19, 2021), and Flight # 912 MCO to ORD (February 22, 2021) showed a "Christian Santiago" was listed on the manifest for both flights. "Santiago" was assigned seat #4B on February 19, 2021, and seat #16B on February 22, 2021.  A "Lucielys Cortez" appeared on both manifests with seat #4C on February 19, 2021, and seat #16A on February 22, 2021. Based on their proximate

13

seat locations and travel dates, investigators believe SANTIAGO-ALBALADEJO and Cortez traveled together to Florida, and back to Illinois.

**Agents Seize 1 Kilogram Cocaine from Parcel 2**

35.     On March 1, 2021, case agents conducted an internal query of incoming parcels to the Milwaukee, Wisconsin region. Case agents located USPS Priority Mail Express Parcel with tracking number EJ542231281US, Parcel 2, which was shipped from Puerto Rico to 9013 Burdick Avenue, Milwaukee, Wisconsin. The shipping label indicated it was sent by a "Manuel Rivera, HC 4 Box 13853, Arecibo; Puerto Rico 00612," and it was addressed to "Jesus Roldan, 9013 W Burdick Ave. Milwaukee, WI 53227."

36.     On March 2, 2021, case agents went to the Root River Post Office located at 11015 West Oklahoma Avenue, Milwaukee, Wisconsin, to locate Parcel 2. Case agents learned that a postal worker had previously marked the parcel as "Return to Sender" because it was addressed to a vacant residence.  A further query of a law enforcement database indicated that both names on the shipping label (Manuel Rivera, and Jesus Roldan) appeared fictitious. Case agents seized the parcel and obtained a search warrant for it.  *See* Case No. 21 802M (NJ).

37.     On March 3, 2021, case agents executed the search warrant on Parcel 2. During a search of Parcel 2, case agents recovered a kilogram of cocaine.  The kilogram had a weight of 1.025 kilograms.  The kilogram had "NKT" stamped on one side.

38.     During follow up, case agents learned that parcels previously sent to 9013 West Burdick Avenue were addressed to "CJ Santiago." Case agents tentatively identified "CJ" as Carlos Javier, a possible relative to SANTIAGO-ALBALADEJO.

14

## Delivery of Parcel 3

39.     On March 5, 2021, case agents identified U.S. Priority Mail Express Parcel with Tracking Number EJ586977103US, Parcel 3, which was shipped from Puerto Rico to 1156 North 25th Street, Milwaukee, Wisconsin. Parcel 3 was addressed to "Familia Santiago, 1156 n 25 st Milwaukee, Wi 53233." The label indicated it was from "Javier Cosme Santiago, RR 5 Box 7704, Toa Alta P.R. 00953-7705."

40.     A search of law enforcement databases showed SANTIAGO-ALBALADEJO as being associated with 1156 North 25th Street. Case agents suspected Parcel 3 contained cocaine and seized the parcel to deliver it using an undercover case agent.

41.     On the same date, case agents initiated surveillance of 1156 North 25th Street. While in an undercover capacity, a case agent delivered Parcel 3 to 1156 North 25th Street and left the parcel unattended on the open porch of the residence. After it was delivered, case agents continued to conduct surveillance. While conducting surveillance of Parcel 3, case agents observed a Hispanic male wearing all dark clothing and dark gloves walk from the rear of the residence towards the porch.

42.     Case agents then observed the same Hispanic male walking back towards the rear of the residence carrying what case agents believed was Parcel 3. Case agents observed the Hispanic male place the parcel on the ground before walking back towards the residence. Case agents confirmed the parcel was no longer on the front porch.

15

43.     Case agents then observed a red Toyota Camry bearing Wisconsin registration ALG-4311 pull into the alley behind 1156 North 25th Street and stop behind the residence.  Seconds later, the Camry was observed leaving the alley.

44.     Case agents initiated a follow using undercover vehicles.  During the follow of the Toyota, the operator began conducting a series of turns onto side streets and squaring the block.  This maneuver is consistent with a counter-surveillance technique.  At this time, case agents lost sight of the Toyota.

45.     A search of Wisconsin Department of Transportation (DOT) records show the Toyota was registered to Alexis Nazario-Andino (DOB: xx/xx/98) of 6600 West Forest Home Avenue, Apartment 108, Milwaukee, Wisconsin, a multi-unit apartment complex. The apartment complex is adjacent to SANTIAGO-ALBALADEJO's apartment complex, located at 6611 West Howard Avenue.

46.     Case agents drove to 6600 West Forest Home Avenue and observed the Toyota parked in the parking lot belonging to 6600 West Forest Home Avenue.  Case agents also observed Nazario-Andino, whose identity was confirmed in part with a DOT photo of Nazario-Andino, walking towards the Toyota. While walking towards the Toyota, case agents observed Nazario-Andino look in the direction of case agents' undercover vehicle and immediately stop, turn around, and walk towards the north entrance belonging to 6600 West Forest Home Avenue.

47.     Case agents initiated surveillance of 6600 West Forest Home Avenue and the Toyota.  While conducting surveillance, case agents later observed a female exit the north entrance of the apartment complex and walk towards the Toyota before stopping

in the parking lot. The female appeared to be looking at the Toyota. The female walked back towards and re-entered the apartment complex.

48.     While conducting surveillance, case agents searched social media, specifically Facebook, and located a Facebook profile for "Alexis Nazario." The profile picture contained a photo of Nazario-Andino. A search of the friends list for "Alexis Nazario" revealed Nazario-Andino was friends with SANTIAGO-ALBALADEJO on Facebook.

49.     During surveillance case agents observed Nazario-Andino exit the apartment complex wearing a surgical mask. Nazario-Andino opened the trunk of the Toyota and appeared to remove an object. Nazario-Andino walked back towards the apartment complex and appeared to be carrying an object. Case agents' visibility was limited due to a snowbank obstructing case agent's view but based on Nazario-Andino's lack of natural movement from his right arm, case agents believed Nazario-Andino was carrying an object.

50.     On this same day, case agents observed Nazario-Andino again exit the apartment complex wearing a baseball cap and surgical-style mask. Nazario-Andino entered the driver's side of the Toyota and drove away from the location.

51.     During the surveillance operation, cases agents became aware that SANTIAGO-ALBALADEJO's cellular phone appeared to be turned off. Case agents contacted the service provider, who informed case agents that during this operation SANTIAGO-ALBALADEJO's cellular phone was ported to a new number.

52.     Based upon the above evidence, case agents believe that Nazario-Andino is a co-conspirator and was assisting SANTIAGO-ALBALADEJO in the trafficking of cocaine that is being shipped via the USPS from Puerto Rico.

### SANTIAGO-ALBALADEJO Fled Wisconsin in a U-Haul

53.     Approximately four days after the delivery and surveillance of Parcel 3, or on March 9, 2021, case agents conducted surveillance of 6611 West Howard Avenue for SANTIAGO-ALBALADEJO.  Case agents observed a U-Haul truck exiting the driveway of the apartment complex.  The U-Haul was being driven by an unknown Hispanic male. SANTIAGO-ALBALADEJO was a passenger in the U-Haul.

54.     Approximately 20 minutes after observing the U-Haul leaving, case agents checked GPS ping notifications for SANTIAGO-ALBALADEJO's cellular phone.  The pings showed the phone was pinging south of Milwaukee near I-94.

55.     Case agents monitored the GPS pings until the phone began frequenting the area in Ocala, Florida.  The GPS pings put the cellular phone in the area of 6600 SW 129th Loop, Ocala, Florida, the same area case agents monitored SANTIAGO-ALBALADEJO's vehicle location via GPS in February 2021.

56.     During this investigation case agents spoke with the CS regarding SANTIAGO-ALBALADEJO.  The CS stated SANTIAGO-ALBALADEJO suspected he was being watched by law enforcement and moved to Ocala, Florida.  SANTIAGO-ALBALADEJO informed the CS that he was going to lay low for a while.

18

**SANTIAGO-ALBALADEJO directed the CS to contact Kaleb Rivera-Reyes and
Wilfredo Reyes-Zapata for cocaine after moving to Florida**

57.     In August 2021, the CS informed case agents that Kaleb Rivera-Reyes and

Wilfredo Reyes-Zapata recently approached the CS and informed the CS that they were

selling cocaine for Christian SANTIAGO-ALBALADEJO. Rivera-Reyes and Reyes-Zapata

told the CS that SANTIAGO-ALBALADEJO was still in Ocala, Florida. Rivera-Reyes and

Reyes-Zapata provided the CS with their cellular phone numbers and told the CS if the CS

wanted kilogram quantities of cocaine to contact them.

58.     The CS identified Rivera-Reyes and Reyes-Zapata by photographs.

Specifically, the CS identified one individual by photograph as Kaleb Rivera-Reyes (DOB:

xx/xx/1999), and the CS also identified the other by the nickname "Surdo," later identified

as Wilfredo Reyes-Zapata (DOB: xx/xx/1970). Furthermore, the CS provided case agents

with Rivera-Reyes' and Reyes-Zapata's phone numbers and a description of a vehicle the

subjects had been observed operating.

**Seizure of 127 Grams of Cocaine from Parcel 4**

59.     On September 29, 2021, case agents identified a suspicious parcel shipped

from Puerto Rico to 2657 North 41st Street, Milwaukee, Wisconsin, via USPS Priority Mail

with Tracking Number 9505511455111267200642, Parcel 4.  Case agents also identified

another suspicious parcel, USPS Priority Mail with Tracking Number

9505512222101258636216, Parcel 5, that was shipped from Puerto Rico to 1102 South 26th

Street, Milwaukee, Wisconsin.

19

60. On September 29, 2021, case agents went to the West Milwaukee Post Office to further inspect Parcel 5. Case agents spoke with a supervisor who stated that a postal worker attempted to deliver the parcel, but the residents at the location refused to accept it and told the carrier that nobody with the name listed on the shipping label resided at the location. Case agents determined the parcel was suspicious, seized it, searched it pursuant to a search warrant. Agents did not seize Parcel 4.

61. During a search of Parcel 5, agents located a large chunk of a white powdery substance. Case agents subjected a sample of the substance to a Nark II field test, which tested positive for cocaine with a total weight of 127 grams.

62. Case agents believe Rivera-Reyes and Reyes-Zapata were associated with the recipient addresses of Parcels 4 (2657 North 41st Street, Milwaukee, Wisconsin) and 5 (1102 South 26th Street, Milwaukee, Wisconsin), in part, for the following reasons.

    a. One of the phone numbers provided for Rivera-Reyes and Reyes-Zapata was subscribed to Joyce J. Padilla-Colon with a billing address of 1102 South 26th Street, Milwaukee, Wisconsin. According to law enforcement databases, Rivera-Reyes and Joyce Padilla-Colon were associated with 1102 South 26th Street, Milwaukee, Wisconsin. A search of publicly available social media on Facebook shows that Rivera-Reyes reported that he was in a relationship with Padilla-Colon.

    b. According to Wisconsin Department of Transportation records, Rivera-Reyes was the registered owner of a 2009 white Nissan Murano bearing Wisconsin license plate AGU-9447. The vehicle was registered to 1102 South 26th Street, Milwaukee, Wisconsin.

    c. According to law enforcement databases, Rivera-Reyes and Padilla-Colon were also associated with 2659 North 41st Street, Milwaukee, Wisconsin. Wisconsin Department of Transportation records show in September of 2021, Rivera-Reyes updated his home address to reflect 2659 North 41st Street. Department of Transportation records also show Padilla-Colon as

20

listing a home address of 2659 North 41st Street. In September 2021, case agents began conducting surveillance of this residence and observed the white Nissan Murano parked behind the duplex located at 2657-2659 North 41st Street, Milwaukee, Wisconsin.

d. Law enforcement databases reflected that Marilyn Reyes, a relative of Rivera-Reyes, was the owner of the duplex at 2657-59 North 41st Street and was residing at 2657 North 41st Street.

**Agents Seize Kilograms of Cocaine from Parcel 6, 7, and 8**

63. On October 11, 2021, case agents identified three suspicious parcels, Parcels 6, 7, and 8, that were shipped from Puerto Rico to Milwaukee via USPS Priority Mail, seized them, and obtained search warrants. Parcels 6, 7, and 8 and their contents are described below.

e. Parcel 6 was identified as USPS Priority Mail parcel with tracking number 9505510336661281472239. The parcel bore a handwritten label addressed to "Joel Olivo Garcia, 2019 S 19th St, Milwaukee WI, 53204-3731." During a search of the parcel case agents recovered a kilogram of cocaine. The kilogram had a weight of 1.050 kilograms. The kilogram had "1-A" stamped on one side with what appeared to be a star below the "1-A."

f. Parcel 7 was identified as USPS Priority Mail parcel with tracking number 9505511455831279491172. The parcel bore a handwritten label addressed to "1966 S 8th st Milwaukee, Wi 53204 3850, Luis o Alvarado Santiago." During a search of the parcel case agents recovered a kilogram of cocaine. The kilogram had a weight of 1.050 kilograms. The kilogram had a crown with "Rolex" stamped on one side. The kilogram had a cross hatch pattern stamped on the other side.

g. Parcel 8 was identified as USPS Priority Mail Parcel with tracking number 9505510334021281218398. The parcel bore a handwritten label addressed to "Wilfredo Reyes Zapata, 2657 N 41st Street, Milwaukee WI 53210- 2436." During a search of the parcel case agents recovered a kilogram of cocaine. The kilogram had a weight of 1.010 kilograms. The kilogram had "1-A" stamped on one side with what appeared to be a star below the "1-A."

**Search Warrants Executed at Rivera-Reyes and Reyes-Zapata Residences**

64.     On October 13, 2021, case agents executed state search warrants on the duplex located at 2657-2659 North 41st Street, Milwaukee, Wisconsin. During the execution of the search warrant, Reyes-Zapata was located on the front porch.

65.     During a search of 2657 North 41st Street, the residence of Reyes-Zapata, case agents located 200.94 grams of powder cocaine and 8.8 grams of crack cocaine in a bedroom. Case agents also located a large quantity of United States currency.

66.     During a search of the northeast bedroom of 2659 North 41st Street, the residence of Rivera-Reyes, case agents located 4.36 grams of powder cocaine and a black Glock 23 .40 caliber handgun.

67.     Thereafter, case agents conducted a *Mirandized* interview of Reyes-Zapata. Reyes-Zapata admitted to possessing and selling cocaine. Reyes-Zapata admitted to living at 2657 North 41st Street. Reyes-Zapata admitted the 200 grams of cocaine recovered from the bedroom belonged to him. Reyes-Zapata also admitted the United States currency recovered belonged to him.  Reyes-Zapata admitted to receiving 4 or 5 parcels containing kilogram quantities of cocaine via the USPS that were shipped to his residence.  Reyes-Zapata stated his street alias is "Zurdo" not "Surdo."

68.     Case agents conducted a *Mirandized* interview of Rivera-Reyes. Rivera-Reyes admitted to residing at 2659 North 41st Street. Rivera-Reyes admitted to possessing the 4.36 grams of cocaine that was recovered from the northeast bedroom. Rivera-Reyes also admitted to possessing the Glock 23 handgun that was recovered from the same bedroom. Rivera-Reyes denied selling cocaine.

Case 2:24-mj-00330-SCD   Filed 02/09/24   Page 28 of 42   Document 1

69.     A search warrant was subsequently obtained for Rivera-Reyes' cell phone, and the lawful extraction reflected that Rivera-Reyes and/or Reyes Zapata had the tracking numbers/history for Parcels 1, 5, 6, 7, and 8, as described as follows:

h.  On October 12, 2021, Reyes-Zapata sent Rivera-Reyes a screenshot of the tracking history for Parcels 6 and 8.

i.  On January 5, 2021, Rivera-Reyes sent "Gragola" a screenshot for USPS tracking history. The tracking history shows a parcel arrive at the Lincoln, Nebraska USPS facility on January 20, 2021. Case agents believe this is the tracking history for Parcel 1, which was intended for the CS and contained a kilogram of cocaine.

j.  On September 21, 2021, Rivera-Reyes sent "Ferrer" text message "1102 s 26th st milwuakee Wisconsin 53204" and "Luis Casillas." "Ferrer" later replied with a photo of a receipt from Parcel 5. As stated above, Parcel 5 contained 127 grams of cocaine and bore a typewritten label addressed to "Luis Casillas, 1102 S 26th St, Milwaukee, WI 53204."

k.  On October 6, 2021, Rivera-Reyes sent "Ferrer" a picture using WhatsApp that depicted mail with the address "1966B South 8th Street, Milwaukee, WI 53204-3850." "Ferrer" replied to the text message with "Nombre," which means "name" in Spanish. Rivera-Reyes replied, "Luis o Alvarado Santiago." The name provided by Rivera-Reyes is the same name on Parcel 7, which parcel bore a handwritten label addressed to "1966 S 8th st Milwaukee, Wi 53204 3850, Luis o Alvarado Santiago."

l.  On October 12, 2021, the user of cellular number 939-745-9295 texted Rivera-Reyes a screenshot of the tracking history for Parcels 6 and 8.

m.  Additional photographs of cocaine, including kilogram quantities, were located on Rivera-Reyes' phone.

**SANTIAGO-ALBALADEJO Arrest**

70.     On January 29, 2024, the Honorable William E. Duffin, United States Magistrate Judge, authorized a Criminal Complaint against SANTIAGO-ALBALADEJO, which Complaint charges SANTIAGO-ALBALADEJO with distribution of controlled substances, and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2(a). An arrest warrant issued that same day. *See* 24 MJ 56.

71.     In January 2024, case agents traveled to Ocala, Florida to locate and arrest SANTIAGO-ALBALADEJO. On January 29, 2024, while conducting surveillance of 13331 SW 39th Avenue, Ocala, Florida, case agents observed SANTIAGO-ALBALADEJO exit the residence carrying a book bag. SANTIAGO-ALBALADEJO was observed entering a white Ford F250 bearing Florida registration GCFS68 with the bag and driving away from the location. Case agents followed SANTIAGO-ALBALADEJO and conducted a traffic stop of SANTIAGO-ALBALADEJO's vehicle. SANTIAGO-ALBALADEJO was taken into custody and was subsequently found to be in possession of the **TARGET TELEPHONE**.

72.     Case agents conducted a *Mirandized* interview of SANTIAGO-ALBALADEJO. During the interview SANTIAGO-ALBALADEJO denied involvement in the distribution of cocaine.   When SANTIAGO-ALBALADEJO was asked if the **TARGET TELEPHONE** contained any photographs of drugs, SANTIAGO-ALBALADEJO acknowledged it would but stated the photos are from Instagram.

73.     The **TARGET TELEPHONE** is currently in the lawful possession of the DEA/HIDTA after being seized pursuant to SANTIAGO-ALBALADEJO's arrest. On February 1, 2024, case agents transported the **TARGET TELEPHONE** to North Central

HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin, where it's currently being stored.

74.     In my training and experience, I know that the **TARGET TELEPHONE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET TELEPHONE** first came into the possession of case agents.

75.     Based on my training and experience, I believe that there is probable cause to believe that SANTIAGO-ALBALADEJO has been engaged in narcotics trafficking. I further believe through training and experience that data can be stored on cellular phones for extended periods of time and also can be transferred to and from other cellular phone devices. Accordingly, I believe that the **TARGET TELEPHONE** is likely to contain evidence of SANTIAGO-ALBALADEJO's narcotics trafficking activities.

## TECHNICAL TERMS

76.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to

25

enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use

26

removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes)

27

and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address

28

is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

77. Based on my training, experience, and research, I know that the **TARGET TELEPHONE** has capabilities that allow it to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

78. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

29

79.     There is probable cause to believe that things that were once stored on the TARGET TELEPHONE may still be stored there, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory

30

"swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

80. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET TELEPHONE** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET TELEPHONE** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

31

information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

81. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET**

32

**TELEPHONE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

82.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

83.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET TELEPHONE** described in Attachment A to seek the items described in Attachment B.

33

## <u>ATTACHMENT A</u>

The property to be searched is a black iPhone in a black case possessed by Christian SANTIAGO-ALBALADEJO on January 29, 2024.

The **TARGET TELEPHONE** is currently being stored at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.

This warrant authorizes the forensic examination of the **TARGET TELEPHONE** for the purpose of identifying the electronically stored information described in Attachment B.

1

## ATTACHMENT B

1.      All records on the **TARGET TELEPHONE** described in Attachment A that relate to violation of Title 21, United States Code, §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and involve Christian SANTIAGO-ALBALADEJO since January 2019, including, but not limited to:

a. lists of customers and related identifying information;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

d. any information recording schedule or travel;

e. all bank records, checks, credit card bills, account information, and other financial records;

f. Photographs and/or videos depicting possession of drugs;

g. Any evidence related to either the ownership, purchase, or possession of drugs;

h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **TARGET TELEPHONE**;

2. Evidence of user attribution showing who used or owned the **TARGET TELEPHONE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.